NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
BILLY JOE MCLAIN (Cal. Bar No. 290682)
Assistant United States Attorney
Violent and Organized Crime Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6702
    E-mail:    billy.mclain@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>          v.<br><br>VERNON WHITE,<br>  aka "Slim," AND<br>ERIC BANKS,<br><br>      Defendants. | No. CR 17-00103-DMG<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT VERNON WHITE'S APPLICATION FOR REVIEW/RECONSIDERATION OF ORDER SETTING CONDITIONS OF RELEASE<br><br>Hearing:    April 23, 2020<br>                9:00 a.m.<br>Location:   Criminal Duty<br>                Courtroom, Roybal<br>                341 |

      Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Billy Joe McLain, hereby files its opposition to defendant Vernon White's application for review/reconsideration of order setting conditions of release.

//

//

//

This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: April 22, 2020　　　　　　　Respectfully submitted,

NICOLA T. HANNA
United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division


　　　　/s/
BILLY JOE MCLAIN
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**Table of Contents**

MEMORANDUM OF POINTS AND AUTHORITIES..................................6
I.   INTRODUCTION......................................................6
II.  FACTUAL BACKGROUND................................................7
     A.   Defendant's Assault Case....................................7
     B.   The Metropolitan Detention Center..........................11
III. Legal Standard...................................................15
IV.  Argument.........................................................16
V.   Conclusion.......................................................19

**Table of Authorities**

**Cases**

United States v. Berckmann,
  2019 WL 984274 (D. Haw. Feb. 28, 2019)............................10

United States v. Blegen,
  2020 WL 1619282 (D. Minn. Apr. 2, 2020)...........................14

United States v. Garcia,
  340 F.3d 1013 (9th Cir. 2003).............................11, 12, 13

United States v. Handy,
  761 F.2d 1279 (9th Cir. 1985).....................................12

United States v. Penaloza,
  2020 WL 1555064 (D. Md. Apr. 1, 2020).............................13

United States v. Sutton,
  695 F. App'x 330 (9th Cir. 2017)..................................10

United States v. Villegas,
  2020 WL 1649520 (C.D. Cal. Apr. 3, 2020)..........................13

United States v. Wheeler,
  795 F.2d 839 (9th Cir. 1986)......................................10

**Statutes**

18 U.S.C. § 113(a)(3)..............................................2
18 U.S.C. § 113(a)(6)..............................................2
18 U.S.C. § 3143(a)(2).........................................1, 10
18 U.S.C. § 3143(a)(2)(A).........................................11
18 U.S.C. § 3143(a)(2)(B).........................................11
18 U.S.C. § 3145(c).........................................1, 11, 12

**Rules**

Fed. R. Crim. P. 46(c).............................................10

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Defendant Vernon White is a lawless and violent criminal.  He is a career offender serving a ten-year sentence for robbery and escape, he stands convicted and is awaiting sentencing for leading a shank-attack ambush on another inmate while in prison, and the sentencing Guidelines for his current crime suggest a release date at the end of this decade.

Defendant cannot satisfy – indeed he is not even close to satisfying – his burden of showing that release is allowed under 18 U.S.C. § 3143(a)(2).  This burden requires defendant to show, by "clear and convincing evidence," that he is "not likely to flee or pose a danger to any other person or the community."  Id. § 3142(a)(2)(B).  Defendant cannot possibly meet this standard, given his history of violence and refusal to follow the law.  That alone should end the matter.

Defendant's burden also requires him to show that the Coronavirus pandemic creates an "exceptional reason" for his release from prison.  See 18 U.S.C. § 3145(c).  Defendant's argument about the Coronavirus pandemic and the weakened state of his health does not rise to that standard.  This is particularly true given the extensive measures the Bureau of Prisons ("BOP") has taken to limit the dangers the Coronavirus presents to inmates as well as the fact that the facility where defendant is incarcerated – the Metropolitan Detention Center ("MDC") – has not had a single inmate test positive for the Coronavirus.

At bottom, the Coronavirus pandemic and defendant's medical condition do not eclipse every other legal barrier that exists to assure violent convicted felons, like him, remain in custody and society remains safe. His application should be denied.

## II. FACTUAL BACKGROUND

### A. Defendant's Assault Case

According to the Presentence Investigation Report ("PSR"), defendant was incarcerated in 2007 for an unarmed bank robbery conviction. PSR ¶ 46. He was released from a federal penitentiary in March 2011 to a residential reentry center, and within two months, he left the reentry center and robbed another bank. Id. ¶ 47. After that, he was sentenced to ten years' imprisonment following convictions for escape and unarmed bank robbery. Id. Defendant is currently in custody with a projected release date of October 2020 for those charges.

While defendant was in custody at the Victorville Penitentiary for his most recent robbery conviction, he led a coordinated shank-attack against an unarmed inmate. He was indicted, along with three codefendants, for assault with a deadly weapon with the intent to do bodily harm, 18 U.S.C. § 113(a)(3), and assault resulting in serious bodily injury, 18 U.S.C. § 113(a)(6). See Doc. No. 1. Defendant exercised his right to a jury trial.

The facts presented to the jury were simple, and the evidence was overwhelming. In fact, still shots from a prison video, which was introduced at trial, capture defendant walking across a soccer field with his codefendants, flanking the victim's position, and then ruthlessly stabbing him. Defendant is circled in red, his

codefendants are circled in green and yellow, and the victim is circled in blue. The trial evidence shows that defendant and his codefendants stabbed the victim repeatedly with plastic shanks between 5.5 and 7.5 inches long. (Government Trial Exhibits ("GX") 75, 77, 79.)



8






At six feet nine inches tall, defendant's identity, even in a grainy video, is unmistakable. Defendant also admitted to the assault on a recorded jail call where defendant explained that the victim called him a snitch so the victim got stabbed in the "face and the neck and the head." (GX 53). On June 20, 2019, the jury quickly returned a verdict convicting defendant and his codefendant – Eric Banks – of both counts.[1] Defendant is scheduled for sentencing on June 16, 2020. Probation recommends 100 months' incarceration and the government recommends 110.

### B. The Metropolitan Detention Center

Defendant is currently housed at the MDC. According to BOP's interactive map that identifies the location of Coronavirus outbreaks throughout the United States, as of today at 10:30 a.m., zero inmates and one staff member from the MDC have tested positive for Coronavirus. See BOP, COVID-19 Cases, available at https://www.bop.gov/coronavirus/ (last visited April 22, 2020).

Additionally, BOP has taken aggressive steps to protect inmates' health and to resist the spread of COVID-19. "[M]aintaining safety and security of BOP institutions is [the BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp; see also BOP, Statement from BOP Director (Mar. 26, 2020) (affirming that the "response [to COVID-19] is the Bureau's top priority"), available at

---

[1] Two other codefendants pleaded guilty.

11

https://www.bop.gov/resources/news/20200326_statement_from_director.jsp.

The BOP has never underestimated the threat of infectious disease. To the contrary, the BOP has had a Pandemic Influenza Plan in place since 2012. Id.; BOP, Pandemic Influenza Plan--Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is highly detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "suspected human outbreak overseas." Id. at i (emphasis added).

At early stages, the Pandemic Influenza Protocol requires BOP facilities to ensure inmates' access to soap, to train them on hand-hygiene practices, and to ensure adequate infection-control supplies. Id. at 9. For every phase thereafter (from preliminary preparation, to a response to active pandemic, to recovery), it includes detailed procedures required of every BOP facility. Id. at 9-11. These include policies creating "social distance" and requiring "frequent environmental cleaning of 'high-touch' surfaces." Id. at 2-3, 6. Facilities must follow protocols on how to identify sick inmates, track their interactions, and quarantine the exposed. Id. at 4-5. They must also establish contingency plans to ensure that medical care is not disrupted, even if faced with an influx of sick inmates. BOP, Pandemic Influenza Plan--Module 3: Health Care Delivery (October 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf. (The BOP has similar protocols for a wide range of diseases. See BOP Program

Statement No. 6190.04, Infectious Disease Management (June 3, 2014), available at https://www.bop.gov/policy/progstat/6190_004.pdf).

The BOP implemented its Pandemic Influenza Protocol in January 2020, modified as a COVID-19 Action Plan. BOP, Action Plan Phase V (Mar. 31, 2020) ("Action Plan Phase V"), available at https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp. In Phase 1 of that plan, the BOP began developing policies in consultation with the Centers for Disease Control (the "CDC"). See BOP, COVID-19 Action Plan: Agency-Wide Modified Operations (March 13, 2020) ("BOP Action Plan"), available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.

Since then, the BOP has serially escalated its response. BOP, Bureau of Prisons Update on COVID-19 (Mar. 24, 2020), available at https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf. On March 13, the BOP moved to Phase 2 of its Action Plan, taking steps to "mitigate the spread of COVID-19" in prisons, for the protection of both inmates and staff. See BOP Action Plan, supra. The BOP suspended social and legal visits, curtailed inmate movement, established enhanced screening procedures for inmates and staff, and curtailed staff travel. Id. Consistent with the Pandemic Influenza Protocol, facilities adopted "modified operations"--including staggered meal and recreation times--to promote social distancing. Id. Just five days later, the BOP escalated to Phase 3--taking additional steps, including ensuring that "all cleaning, sanitation, and medical supplies" had been inventoried and were adequately stocked. Id.

Phases 4 and 5 followed in late March; Phase 6 followed in mid-April.  Beginning March 26, the BOP required all newly admitted inmates to be quarantined or isolated for a minimum of 14 days "or until cleared by medical staff." See Action Plan Phase V, supra.  On April 1, the BOP instituted a nationwide lockdown.  Id.  For at least a two-week period, "inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus."  Id.  The BOP has also "significantly decreas[ed] incoming movement.  Id.  Modified operations will continue, for all institutions, until at least May 18, 2020.  BOP, BOP COVID-19 Action Plan: Phase 6 (April 14, 2020), available at https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf.

Meanwhile, the BOP has continued working with the CDC, confirming that its approach aligns with current CDC guidance for COVID management in correctional facilities.  BOP, Correcting Myths About BOP and COVID-19, at 1, available at https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf.  Currently, BOP medical staff are "conducting rounds and checking inmate temperatures at least once a day"--twice a day where inmates are quarantined or in isolation.  Id.  All BOP staff and inmates have been issued cloth masks to wear on a daily basis--with staff required to wear masks, gloves, and potentially gowns when dealing with isolated and quarantined inmates.  Id. at 1, 3.  "Cleaning supplies have been provided to inmates," and the BOP has provided training on CDC best practices regarding disease

transmission and prevention (including sanitation).  Id. at 2.  Common areas are sanitized multiple times a day.  Id. at 3.

The gravity and severity of these measures reflect BOP's commitment to fighting COVID-19 and protecting inmates.  And, although the BOP has not been immune from the pandemic, it has "thus far been fortunate in that [its] rate of COVID-19 infection is remarkably low."  Statement from BOP Director, supra.

**III. Legal Standard**

The burden is on defendant to show he is entitled to release from custody pending sentencing.  Fed. R. Crim. P. 46(c); see United States v. Wheeler, 795 F.2d 839, 840 (9th Cir. 1986).  In this case, defendant was convicted of a crime of violence.  See United States v. Sutton, 695 F. App'x 330, 331 (9th Cir. 2017) (explaining that 18 U.S.C. § 113(a)(3) is a crime of violence); United States v. Berckmann, CR 17-00710-SOM, 2019 WL 984274, at *2 (D. Haw. Feb. 28, 2019) (same).  Consequently, the applicable statute is 18 U.S.C. § 3143(a)(2).

The relevant legal framework requires defendant to establish two things before he is released from custody pending sentencing.  First, that "clear and convincing evidence" shows he "is not likely to flee or pose a danger to the safety of any other person or the community if released."  18 U.S.C. § 3143(a)(2)(B).  If he can satisfy the first requirement, he must then clearly show "exceptional reasons allowing his release" under 18 U.S.C. § 3145(c).[2]  See United States

---

[2] Technically, 18 U.S.C. § 3143(a)(2)(A) requires defendant to prove (1) "there is a substantial likelihood that a motion for acquittal or new trial will be granted" or (2) "an attorney for the Government has recommended that no sentence of imprisonment be

15

v. Garcia, 340 F.3d 1013, 1014 n.1 (9th Cir. 2003) (applying section 3145(c) to district court determinations).

## IV.  Argument

Defendant cannot carry his burden of showing by clear and convincing evidence that he "is not likely to flee or pose a danger to the safety of any other person or the community if released."  18 U.S.C. § 3143(a)(2)(B).

As to flight risk, defendant is coming down to the final months of a ten-year sentence for bank robbery.  And now the government is recommending that the district court add another 110 months for his recent felony convictions (which is a low-end Guideline recommendation).  On those facts alone, defendant has significant motivation to flee.

What's more, the last time defendant was released from a federal penitentiary to a residential reentry center, he fled and robbed a bank (which was the defendant's third bank robbery conviction).  PSR ¶¶ 45-47.  In light of these facts, defendant simply cannot show by clear and convincing evidence that he is not a flight risk.

Defendant is also a serious danger to the community. Defendant's three bank robbery convictions alone demonstrate as much. But the ruthlessness that led to defendant's current assault convictions display defendant's dangerousness on a new level. Indeed, even within the confines of high-security federal penitentiary, defendant presents a danger to his fellow inmates.

---

imposed."  But those requirements are essentially rendered a nullity if defendant can establish "exceptional reasons" under 18 U.S.C. § 3145(c).

Under no circumstances can defendant show, by clear and convincing evidence, that he is not a danger to the community outside of prison.

Because defendant cannot show that he is (1) not a flight risk and (2) not a danger to the community, the Court should deny his application.

The Court should also deny defendant's application because the general argument his application raises – that his health condition and the Coronavirus pandemic support his release (Doc. No. 214) – does not clearly show an "exceptional reason" as required under 18 U.S.C. § 3145(c).

The Ninth Circuit has held that section 3145(c) applies only in "truly unusual circumstances." United States v. Garcia, 340 F.3d 1013, 1019-20 (9th Cir. 2010). The standard is circumscribed because the Bail Reform Act reflects Congress's intent to "make [] it considerably more difficult" for a convicted defendant to remain on bail. See United States v. Handy, 761 F.2d 1279, 1283 (9th Cir. 1985); see also Garcia, 340 F.3d at 1019 (courts must "bear[] in mind the congressional policy that offenders who have committed crimes of violence should not, except in exceptional cases, be released pending sentencing or appeal").

The Ninth Circuit has identified examples of exceptional reasons that might warrant a departure from the ordinary prohibition on post-conviction bail: (1) where a defendant is "severely ill or injured" and incarceration may interrupt a course of treatment; (2) where the offense was aberrational; or (3) where the sentence imposed is so short the defendant might serve most or all of it prior to resolving his appeal. Id. at 1018-19. Although the list is not exhaustive, it

serves to illustrate that the exception is a narrow one. "Hardships that commonly result from imprisonment do not meet the standard." Id. at 1022. "The general rule must remain that conviction for a covered offense entails immediate incarceration." Id.

The existence of the Coronavirus pandemic alone is not the type of exceptional circumstance that section 3145(c) was meant to address. See, e.g., United States v. Villegas, 19-CR-568-AB-SK, 2020 WL 1649520, at *2 (C.D. Cal. Apr. 3, 2020) ("No matter the heightened risks intrinsic to prison populations as a matter of public health, the Court has no authority as a matter of law to permit pretrial release under the Bail Reform Act just because of the current pandemic's generic risks."); United States v. Penaloza, 19-CR-568-AB-SK, 2020 WL 1555064, at *2 (D. Md. Apr. 1, 2020) ("[T]he mere presence of the virus, even in the detention setting, does not automatically translate to the release of a person accused").

Moreover, even when defendant's underlying health risks are examined alongside the Coronavirus pandemic, he cannot clearly show exceptional reasons justifying his release from custody. After all, the MDC has not reported a single inmate who has tested positive for the Coronavirus. See supra. So unless something drastically changes at the MDC, there is no factual basis for defendant to stand upon.

Along these same lines, given the extensive measures BOP has taken to limit risks the Coronavirus presents to inmates, see supra, defendant cannot demonstrate any likelihood that there will be drastic changes at the MDC in terms of the potential for his exposure to the Coronavirus. See, e.g., United States v. Blegen, 2020 WL 1619282, at *4 (D. Minn. Apr. 2, 2020) (finding "the COVID-19

outbreak does not constitute an exceptional reason" for release before sentencing based in part on the "significant step [the facility] has undertaken to prevent and mitigate the risks posed by COVID-19 to inmates' health and safety"). Ultimately, defendant cannot clearly show exceptional reasons exist to allow his release from prison, and his application should be denied for that reason as well.

**V.  Conclusion**

For the reasons set forth above, the Court should deny defendant's application for release.